IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *   CRIMINAL NO. PX-19-236 |
| MARTREL REEVES, | * |
| | * |
| Defendant. | * |
| | * |
| | ******* |

## GOVERNMENT'S SUR-REPLY TO DEFENDANT'S PRETRIAL MOTION

The United States of America, by and through undersigned counsel, respectfully submits the following sur-reply in response to Defendant's Motion to Dismiss, Or Alternatively, Motion in Limine Regarding Interstate Nexus. (ECF No. 27.) For the reasons set forth below and in the Government's opposition brief, (ECF No. 29), the Defendant's motion should be denied.

## ARGUMENT

The Government argued in its opposition brief that possession of intrastate ghost guns taken in the aggregate affects interstate commerce. In creating a framework for regulating the production, distribution, and possession of classes of firearms under the Gun Control Act, "Congress expressly declared that 'the receipt, possession, or transportation of a firearm by felons . . . constitutes . . . a burden on commerce or threat affecting the free flow of commerce.'"[1] *Scarborough v. United States*, 431 U.S. 563, 571 (1977); *see also United States v. Carpio-Leon*, 701 F.3d 974, 983 (4th Cir. 2012) (referencing The Omnibus Crime Control and Safe Streets Act

---

[1] The U.S. Supreme Court's decision in *Scarborough* concerned Title VII of the Omnibus Crime Control and Safe Streets Act of 1968. "Four months after enacting the Omnibus Act, the same Congress amended and reenacted Titles IV and VII as part of the Gun Control Act of 1968." *Ball v. United States*, 470 U.S. 856, 862 n.10 (1985). "The Gun Control Act 'reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.'" *Id.* (quoting *Barrett v. United States*, 423 U.S. 212, 220 (1976).)

1

of 1968 for the rational basis to uphold 18 U.S.C. § 922(g)(5).)  Congress then proceeded to prohibit possession of firearms by felons in or affecting commerce.  *Id.*  By including the language "affecting commerce" in 18 U.S.C. § 922(g), Congress exercised its Commerce Clause power to "reach [firearm] possessions broadly," "because [s]tate gun control laws were found 'inadequate.'"  *Scarborough*, 431 U.S. at n.11 (noting that "Congress is aware of the distinction between legislation limited to activities in commerce and an assertion of its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce.")

The intrastate possession of ghost guns by prohibited persons undercuts this Congressional intent.  Ghost guns displace the possession and sale of conventional firearms, as ghost guns are fungible with regular guns.[2]  This fungibility not only makes ghost guns an economic substitute for conventional firearms, but it makes ghost guns difficult to distinguish in the broader firearms market.  This allows ghost guns to easily bleed into the interstate market, including being diverted into "illicit channels"—such as the possession of ghost guns by prohibited persons.  *Gonzales v. Raich*, 545 U.S. 1, 22 (2005).  By finding that possession of a ghost gun as a class of activity, taken in the aggregate, substantially affects interstate commerce, and therefore satisfies the commerce element, the Court would give effect to Congress's intent and statutory language—"affecting commerce"—to keep firearms out of the hands of felons.

---

[2] Contrary to the Defendant's argument in his reply brief, the weapon he possessed when he was stopped and later arrested qualified as a firearm as defined in 18 U.S.C. § 921(a)(3)(A)—in that it "will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  (*See* ECF No. 27-1 at 4.)  As the Government noted in its opposition brief, conventional guns are assembled and meet the definition of a "firearm" under the statute prior to their travel in interstate commerce.  In contrast, with a ghost gun it is difficult to determine whether the gun was assembled into a firearm before it traveled in interstate commerce.  However, once assembled, a ghost gun is no different from a conventional firearm—either in its purpose, its use, or its qualification under the statutory definition.

Since filing its opposition brief, the Government has received responses to its trial subpoenas from ghost gun kit suppliers and distributors. These responses demonstrate the substantial monetary sales and volume of purchases of ghost guns in Maryland. Between 2016 and 2019, Brownells, Inc., a supplier of firearm accessories and gun parts headquartered in Iowa, sold a total of 5,011 parts kits in Maryland and earned approximately $389,579 from those sales:

|  | **Total Parts Kits Sold in Maryland** | **Total Sales Revenue from Parts Kits Sold in Maryland** |
|---|---:|---:|
| **2016** | 348 | $21,158.97 |
| **2017** | 1462 | $105,155.96 |
| **2018** | 1965 | $155,862.42 |
| **2019** | 1236 | $107,402.26 |
| **Total Overall** | **5011** | **$389,579.61** |

Similarly, in between 2016 and 2019, MidwayUSA, another distributor of firearms, firearm parts, and outdoor supplies, headquartered in Missouri, sold 5,145 parts kits in Maryland and earned approximately $483,557 from such sales:

|  | **Total Parts Kits Sold in Maryland** | **Total Sales Revenue from Parts Kits Sold in Maryland** |
|---|---:|---:|
| **2016** | 575 | $53,942.11 |
| **2017** | 1662 | $139,421.30 |
| **2018** | 1769 | $177,967.59 |
| **2019** | 1139 | $112,226.71 |
| **Total Overall** | 5145 | $483,557.71 |

Finally, the Government also served trial subpoenas on a number of gun stores in Maryland. Almost all of the gun stores informed the Government that they have not engaged in the sale of ghost gun kits. The only store that has sold ghost gun kits in volume is Fred's Outdoors in Waldorf, Maryland. Fred's Outdoors sold 148 parts kits in 2018 and 194 in 2019. This generated total sales of approximately $35,262. All of these parts kits were provided by manufacturers located outside the State of Maryland to Fred's Outdoors, which in turn sold them to customers in Maryland.

Analyzing this data as a whole, and incorporating the sales numbers from Polymer80, over the past four years approximately 8.5 ghost gun parts kits were sold every day to an individual in the State of Maryland, with cumulative sales of over $1 million. These ghost guns create an intrastate supply for firearms that "can enter the interstate market and affect supply and demand." *United States v. Stewart*, 451 F.3d 1071, 1078 (9th Cir. 2006) ("[T]here is a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession is essential to effective control of the interstate incidents of such traffic.")

Additionally, as noted in its opposition brief, the Government intends to present an expert economist, Dr. John W. Mayo, to testify at the motions hearing regarding the effect that ghost guns have on the market for handguns, which are bought and sold in interstate commerce. Dr. Mayo is the Elsa Carlson McDonough Chair of Business Administration and Professor of Economics, Business and Public Policy in the McDonough School of Business at Georgetown University, receiving his Ph.D. in economics from Washington University in St. Louis, and possessing extensive research and teaching experience in the fields of economics, business, and public policy. (Ex. A ¶¶ 3-5.)

Dr. Mayo calculated that the presence of ghost guns in the marketplace impacts the handgun market by depressing the price of conventional handguns by 3% to 7.5%—a substantial effect. (*Id.* ¶ 7.) Due to the nascent and unregulated nature of the ghost gun market,[3] Dr. Mayo has relied on verified numbers from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in

---

[3] It is this unregulated nature of the ghost gun market that the U.S. Congress appears to be attempting to confront in the proposed bills aimed at expanding the definition of a "firearm" in 18 U.S.C. § 921(a)(3)(A). Such bills would subject ghost gun manufacturers and sellers to the same requirements as those for conventional firearms: (i) background checks, (ii) recordkeeping, and (iii) unique serialization requirements, among others. By contrast, Congress has already exercised its commerce power broadly in 18 U.S.C. § 922(g) to keep intrastate firearms that affect commerce out of the hands of prohibited individuals—including ghost guns. *See Scarborough*, 431 U.S. at 571.

Maryland, which the Government provided in its opposition brief. (ECF No. 29 at 32.) Based on the fact that ghost guns increase the total number of recovered firearms, specifically handguns, by 18%, as well as relying on fundamental economic precepts and a peer reviewed paper that studied the price elasticity of the demand for firearms, Dr. Mayo calculated that the addition of ghost guns to the market for handguns reduces the price of conventional firearms by 5.5% to 7.5%. (Ex. A ¶¶ 12-13.) The corollary is true as well, as removing ghost guns from the marketplace would increase the price of conventional firearms by 5.5% to 7.5%.

Dr. Mayo tested the robustness of his conclusion, conducting additional research to employ more recent data on the handgun market. Based on this data, Dr. Mayo calculated that ghost guns depress the price of conventional handguns by 3%—or between 3% and 7.5% based on the time period of data employed. (*See* Ex. A ¶ 16.) Such a discernible and statistically significant effect on the price of conventional handguns allows Dr. Mayo to conclude, as he will testify at the hearing, that ghost guns taken in the aggregate have a substantial impact on the market for conventional handguns—an interstate market. (*Id.*) Based on this substantial effect that ghost guns have on the supply, demand, and prices for conventional firearms in the interstate market, an area in which Congress sought to enact a federal ban on the sale to and possession by felons, failure to include intrastate possession of ghost guns "would leave a gaping hole" in Congress's stated intent. *Raich*, 545 U.S. at 22.

The fungible nature of ghost guns, the difficulty distinguishing them from conventional firearms, the potential diversion of ghost guns into the interstate market and illicit channels, and the quantified effect that ghost guns as an economic substitute have on the supply, demand, and price of conventional firearms, taken as a whole, establish that intrastate possession of a ghost gun as a class of activity, in the aggregate, substantially affects interstate commerce. Accordingly, the

commerce element of 18 U.S.C. § 922(g) is satisfied if the Government proves beyond a reasonable doubt at trial that (a) the firearm alleged in the indictment is a ghost gun—a homemade or home-completed and assembled gun—and (b) that the Defendant possessed said ghost gun.

## CONCLUSION

Based on the above, as well as the reasons articulated by the Government in its opposition brief, the Court should deny all of the Defendant's motions in full.

Respectfully submitted,

\_\_\_\_\_/s/_____
Rajeev R. Raghavan
Erin B. Pulice
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on March 5, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                /s/
                Rajeev R. Raghavan
                Assistant United States Attorney