# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *   CRIMINAL NO. PX-19-236 |
| MARTREL REEVES, | * |
| | * |
| Defendant | * |
| | * |

*******

## DECLARATION OF JOHN W. MAYO

The undersigned, being first duly sworn on oath, hereby declares and affirms as follows:

### A. Introduction and Assignment

1. My name is John W. Mayo. My business address is Georgetown University, McDonough School of Business, 37th and O Streets, N.W., Washington, D.C., 20057.

2. I have been asked by the U.S. Attorney's office for the District of Maryland to investigate the impact of ghost guns on the handgun market in the United States.

### B. Qualifications

3. I am the Elsa Carlson McDonough Chair of Business Administration and Professor of Economics, Business and Public Policy in the McDonough School of Business at Georgetown University. I am also the Executive Director of the Georgetown Center for Business and Public Policy. I have held numerous leadership positions in the University, including Dean of the McDonough School. I also have been an invited Visiting Scholar at Stanford University and the University of California, Berkeley.

4. I hold a Ph.D. in economics from Washington University in St. Louis (1982), with a principal field of concentration in industrial organization, which includes the analysis of antitrust and regulation. I also hold both an M.A. (Washington University in St. Louis, 1979) and a B.A. (Hendrix College, Conway, Arkansas, 1977) in economics. I have taught both undergraduate and graduate economics, business and public policy courses at Georgetown University, Washington University, the University of Basel (Switzerland), the University of Tennessee, and Virginia Tech.

5. I have authored numerous peer-reviewed articles, research monographs, and a number of specialized articles in economics, law, and public policy. These have appeared in academic journals such as the *RAND Journal of Economics, Journal of Law and Economics, Journal of Industrial Economics, International Journal of Industrial Organization, Review of Network Economics, Review of Industrial Organization, Journal of Regulatory Economics* and *Yale Journal on Regulation*. I have also written a comprehensive text entitled *Government and Business: The Economics of Antitrust and Regulation*. In addition, I have served as President of the Transportation and Public Utilities Group and am currently serving in editorial capacities for the *Journal of Regulatory Economics, Economic Inquiry* and the *Review of Industrial Organization*.

6. Additionally, I have been an economic advisor for, and consultant to, both public agencies and private companies, including the Antitrust Division of the United States Department of Justice, the Federal Trade Commission, AT&T, Sprint, UPS and AmerenUE.

## C. Summary of Conclusions

7. I find that the presence of ghost guns in the handgun market has a discernible economic impact on the price of conventional handguns. Using empirical estimates of the price elasticity of demand for conventional handguns, I am able to calculate that the impact of ghost guns in the market depresses the price by between 3 percent and 7.5 percent, depending on the data employed.

## D. Overview of Analysis

8. My analysis consisted of three parts. In the first part, I identified a commonly used economic concept that would best enable me to understand conceptually the impact of ghost guns on the market for handguns in the United States. This concept is known as the price elasticity of demand. The price elasticity of demand can be represented as a simple formula that measures the sensitivity of the quantity demanded of a good or service to a change in price of that good or service. In the second part, I drew upon the existing economic literature and information provided by the Bureau of Alcohol, Tobacco and Firearms (ATF) to provide data that can be used to populate the formula. With these elements in place, I determine that ghost guns affect the price of conventional, commercially-provided handguns. And in the third part, I investigated the robustness of the conclusions.

### E. Detailed Analysis

9. My understanding is that a ghost gun is a firearm that does not have an engraved serial number but which, when properly assembled, is a functional substitute for a conventional, commercially purchased handgun. A salient question is whether and to what extent the presence or absence of ghost guns impacts the market price for conventional, commercially-purchased handguns.

10. To determine this impact of ghost guns on the market for handguns, I draw upon the economic concept known as the price elasticity of demand. The price elasticity of demand is simply the percentage change in the quantity demanded of a good or service divided by the percentage change in the price of that good or service. It is possible to write this in a simple equation: $e = \frac{q'}{p'}$, where $e$ is the price elasticity of demand, $q'$ is the percentage change in the quantity demanded of the good or service, and $p'$ is the percentage change in price of that good or service. Note that we can rearrange this formula to be $p' = \frac{q'}{e}$. Thus, if the values of $e$ and $q'$ are known, then it is possible to calculate the value of the percentage price change associated with a change in the quantity of the good or service.

11. To garner values for the price elasticity of demand for handguns, $e$, I turned to existing evidence in the economic literature. In particular, I rely upon a detailed study by Douglas C. Bice and David D. Hemley "The Market for New Handguns: An Empirical Investigation," Journal of Law and Economics, Vol. 45, April 2002, pp. 251-265. In this study, Bice and Hemley assemble data relevant to both the demand for and supply of new handguns sold in the United States. The study then employs econometric methods to produce estimates of both the demand and supply of handguns sold in the United States. Across four different specifications of the demand function, the price of handguns is found consistently to be a statistically significant driver of the demand for handgun sales. The values of the estimated price elasticity of demand are found to range from -2.4 to -3.3.[1]

12. Next, I turn to the value of $q'$. The U.S. Attorney's office provided me with the necessary data. Specifically, I was provided with the number of ATF conventional handgun and ghost gun recoveries in Maryland for the period January 1, 2019 – December 5th, 2019. Based on that information, I understand that there were 356 conventional handgun recoveries and an additional 65 ghost gun recoveries in that period. Thus, ghost guns augmented the amount of conventional handguns by 18%

---

[1] Because price and the quantity demanded for products is typically inversely related, the price elasticity is negative. Aware of this, economists often simply drop the minus sign when reporting such elasticities. For instance, Bice and Hemley report that "The price elasticity of demand varies between 2.4 and 3.3 across the four specifications." (p. 260)

(=65/356). Accordingly, I use 18 percent as the estimate of q' to quantify the impact of the presence of ghost guns on the market.

13. With these data in hand, we can use the re-written price elasticity formula $p' = \frac{q'}{e}$ to calculate the impact of the addition of ghost guns on the price of handguns more generally. Specifically, $p'$ is found to range from -5.5% [=18/(-3.3)] to -7.5% [=18/(-2.4)]. That is, estimates of the price elasticity of demand from the published economic literature indicate that the price of conventional handguns is discernibly reduced as a consequence of the presence of ghost guns in the marketplace.

### F. Robustness

14. While the empirical estimates above provide a foundation for understanding that the presence of ghost guns has a discernible impact on the price of handguns purchased in typical interstate commerce, it is possible to test the robustness of this conclusion. For instance, given the passage of time, more recent data are available than are employed in Bice and Hemley's paper. To test the robustness of the basic conclusion that the price of handguns is affected by the quantity of ghost guns provided to the market, I gathered updated data on the handgun market from 1980-2018. A description of the variables collected and the source for each variable is provided in Appendix A.

15. Following the general approach of Bice and Hemley, I then estimated the underlying demand and supply equations in the market for handguns. Deviations from Bice and Hemley's specifications were necessitated by three things: (1) some variables (e.g., the price of shotguns) which were included in their earlier analysis are no longer collected and available; (2) some variables (e.g., a variable indicating the passage of the Gun Control Act of 1968) are irrelevant because they are outside the window of the new data; and (3) some policy changes and expected policy changes occurred in the window of the new data (e.g., the passage of the Protection of Lawful Commerce in Arms Act in 2005) that are potentially relevant drivers of either the demand for or supply of handguns.

16. Using these updated data and variables, I find that the price elasticity of demand for handguns remains negative and statistically significant. That is, I can confidently (probability > .99) conclude that the price elasticity of demand remains different from zero. The estimated elasticity for the updated model is -6.0, which indicates that the addition of ghost guns into the market produces a price reduction of -3% [=18/(-6.0)]. While the precise quantitative estimate of the impact of ghost guns on the handgun market varies depending on the particular time period of the data employed, the basic conclusion remains that the addition of ghost guns into the market has a discernible effect on the price of conventional handguns that are bought and sold in interstate commerce.

17. My analysis is ongoing. If new data or information is provided to me that is relevant to my conclusions, I reserve the right to update my statement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on:

2/26/20
Date

John W. Mayo, Ph.D.

## Appendix A: Variables Employed in Analysis

| Variable Name | Years Covered | Units | Source(s): |
|---|---|---|---|
| Year | 1980-2018 | | |
| Pistols Manufactured | 1980-2018 | Number | - 1980-1985: Commerce in Firearms in the United States, February 2000 Report; Table A.1.1 Firearms Manufacturers' Shipments<br>- 1986-2017: Firearms Commerce in the United States, Annual Statistical Update 2019;[i] Exhibit 1 Column 2<br>- 2018: ATF "Annual Firearms Manufacturing and Export Report 2018 Final[ii]" Cover Page |
| Revolvers Manufactured | 1980-2018 | Number | - 1980-1985: Commerce in Firearms in the United States, February 2000 Report; Table A.1.1 Firearms Manufacturers' Shipments<br>- 1986-2017: Firearms Commerce in the United States, Annual Statistical Update 2019; Exhibit 1 Column 3<br>- 2018: ATF "Annual Firearms Manufacturing and Export Report 2018 Final" Cover Page |
| Pistols Exported | 1980-2018 | Number | - 1980-1985: Commerce in Firearms in the United States, February 2000 Report; Table A.1.1 Firearms Manufacturers' Shipments<br>- 1986-2017: Firearms Commerce in the United States, Annual Statistical Update 2019; Exhibit 2 Column 2<br>- 2018: ATF "Annual Firearms Manufacturing and Export Report 2018 Final" Cover Page |
| Revolvers Exported | 1980-2018 | Number | - 1980-1985: Commerce in Firearms in the United States, February 2000 Report; Table A.1.1 Firearms Manufacturers' Shipments<br>- 1986-2017: Firearms Commerce in the United States, Annual Statistical Update 2019; Exhibit 2 Column 3<br>- 2018: ATF "Annual Firearms Manufacturing and Export Report 2018 Final" Cover Page |
| Handguns Imported | 1980-2018 | Number | - 1980-1985: Commerce in Firearms in the United States, February 2000 Report; Table A.1.1 Firearms Manufacturers' Shipments |

| | | | |
|---|---|---|---|
| | | | - 1986-2017: Firearms Commerce in the United States, Annual Statistical Update 2019; Exhibit 3 Column 4<br>- 2018: ATF "Annual Firearms Manufacturing and Export Report 2018 Final" Cover Page |
| Disposable Income | 1980-2018 | 2012 Chained Dollars, per Capita figure | - Economic Report of the President (2019) [iii] page 657; Table B-18 |
| Population Total | 1980-2018 | In thousands; Non-institutional; Annual made from average of quarterly; Not seasonally adjusted; Ages 16+ | - Bureau of Labor Statistics Current Population Survey – Employment status of the civilian non-institutional population 16 years and over by sex, 1970s to date[iv] |
| Gun Input Price | 1980-2018 | Index | - Bureau of Labor Statistics<br>- PPI for NAICS 331 (metal/iron manufacturing)[v] – dates back to 1985<br>- PPI for 1980-185 comes from "Producer Price Index by Commodity for Metals and Metal Products: Iron and Steel" (WPU101) from FRED Economic database[vi]<br>- Yearly Figure is the Average Monthly PPI |
| PPI Finished Goods | 1980-2018 | Index | - FRED, PPI of Finished Goods[vii]; Yearly figure is average monthly PPI |
| PPI Commodity Small Arms | 1980-2018 | Index | - "PPI Commodity data for Miscellaneous products - small arms, not seasonally adjusted" - BLS, Series WPU151301[viii]<br>- Yearly Figure is the Average Monthly PPI |
| Crime | 1979-2018 | Violent Crime Rate Per 100,000 inhabitants | - 1979-2014: Uniform Crime Reporting Statistics UCR Data Tool Site[ix]<br>- 2015-2018: FBI Uniform Crime Reporting Statistics; 2018 Table 1—Crime in the United States, by Volume and Rate per 100,000 Inhabitants[x] |
| Police | 1980-2016 | Police Expenditures per Capita | - For 1980-2016: Bureau of Justice Statistics, Justice Expenditures and Employment Extracts[xi]<br>- 1980 – 1999 were from the EETRND11<br>- Found through clicking Data Tables, then going to Table 8, then Total for "Police Protection" |
| Handguns | 1980-2018 | Per 1,000 persons in age 16+ non-institutionalized population | - (Pistols manufactured + Revolvers Manufactured – Pistols Exported – Revolvers Exported + Handguns Imported) / Population Total |

| Handgun Price | 1980-2018 | Index | - PPI Commodity Small Arms / PPI Finished Goods |
| --- | --- | --- | --- |
| Federal Firearm Licensees | 1980-2018 | Number | - From Exhibit 10 in Firearms Commerce in the United States, Annual Statistical Update 2019[xii] – Includes "Dealer" "Pawnbroker" and "Collector" |
| BRADY | 1992, 1993 | Dummy Variable = 1 if years are 1992 and 1993 = 0 otherwise | - This dummy variable is used to capture the effect that the passage of the BRADY Handgun Violence Prevention Act may have had on the demand for handguns. |
| OBAMA | 2009-2016 | Dummy Variable = 1 if year = 2009-2016 = 0 otherwise | - This dummy variable is used to capture the effect that the Obama White House may have had on the demand for handguns. |
| PLCA | 2006-2018 | Dummy Variable = 1 if year >= 2006 = 0 otherwise | - The Protection of Lawful Commerce in Arms Act (PLCA) removed the threat of firearm manufacturers from being sued in the event of mass shootings. This dummy variable is used to capture the effect that the PLCA may have had on the supply for handguns. |

## Links to Access Sources

[i] https://www.atf.gov/firearms/docs/report/2019-firearms-commerce-report/download
[ii] https://www.atf.gov/file/142946/download
[iii] https://www.whitehouse.gov/wp-content/uploads/2019/03/ERP-2019.pdf
[iv] https://www.bls.gov/cps/cpsaat02.pdf
[v] https://data.bls.gov/pdq/SurveyOutputServlet
[vi] https://fred.stlouisfed.org/series/WPU101
[vii] https://fred.stlouisfed.org/series/WPSFD49207
[viii] https://fred.stlouisfed.org/series/WPU151301
[ix] https://www.ucrdatatool.gov/Search/Crime/State/RunCrimeStatebyState.cfm
[x] https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-1/table-1.xls#overview
[xi] https://www.bjs.gov/index.cfm?ty=pbse&sid=33
[xii] https://www.atf.gov/firearms/docs/report/2019-firearms-commerce-report/download