**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| v. | * |
| | *   **CRIMINAL NO. PX-19-236** |
| **MARTREL REEVES,** | * |
| | * |
| **Defendant.** | * |
| | * |

*******

**GOVERNMENT'S OPPOSITION TO TACTICAL GEAR HEAD'S
MOTION TO QUASH THIRD PARTY SUBPOENA**

The United States of America, by and through undersigned counsel, respectfully submits the following opposition in response to Tactical Gear Head's ("TGH") Motion to Quash Third Party Subpoena. (ECF No. 36.) For the reasons set forth below, TGH's motion should be denied.

**BACKGROUND**

**I.   Procedural Background**

On November 22, 2019, the Government served a Rule 17 subpoena on TGH. (ECF No. 36, Ex. B.) The subpoena was served following the Defendant Martrel Reeves's Motion to Dismiss the Indictment. (ECF No. 27.) The subpoena stated the original date and time of the scheduled hearing for the pretrial motions—December 30, 2019 at 1 p.m. In the attachment to the subpoena, the Government listed three specific categories of information that the Government was seeking for the limited time period from January 1, 2015, to the date of the subpoena:

1. The total number (per year) of unfinished pistol and rifle parts kits sold and/or shipped to an address in the State of Maryland;

2. The prices for said unfinished pistol and rifle parts kits sold and/or shipped to Maryland; and

      3. The total revenue that TGH generated based on unfinished pistol and rifle parts kits that were sold and/or shipped to an addressee in the State of Maryland.

(ECF No. 36, Ex. B.) On December 5, 2019, undersigned counsel spoke with a legal representative for TGH. (ECF No. 36, Ex. C at 1.) The Government explained to counsel that it was seeking data on the total volume of business that TGH has conducted in Maryland based on the sales of ghost gun kits—as detailed in the attachment to the subpoena. (*Id.* at 2.) TGH's counsel was informed—consistent with the opposition brief that the Government filed in this matter (ECF No. 29)—that the Government intended to show that the Defendant's possession of a ghost gun was part of a class of activity that has a substantial effect on interstate commerce, and that TGH's sales of ghost gun kits in Maryland was relevant to establishing such an effect.

      Following this, the TGH legal representative informed the Government of the company's intent to oppose the subpoena. (ECF No. 36, Ex. C.) In responding to TGH's letter, undersigned counsel informed the legal representative that: (a) the Government did not intend to withdraw the subpoena; and (b) that the Court had rescheduled the hearing to March 20, 2020. (ECF No. 36, Ex. D.) On March 5, 2020, TGH's counsel, counsel that filed the instant motion to quash, contacted the Government to inquire if the Government would withdraw the subpoena, as TGH did not sell any ghost gun kits in the State of Maryland until 2019. Counsel later clarified that the first sale to a Maryland resident occurred on July 30, 2018. The Government responded that it would not withdraw the subpoena, but that it would reissue a new one to reflect the rescheduled date and time of the hearing. The Government issued this new subpoena on March 11, 2020. (ECF No. 36, Ex. E.)

**II.     Background on TGH**

TGH is an online retailer founded in 2014 and based in Indianapolis, Indiana, that appears to operate three websites for the purpose of selling ghost gun kits, ammunition, and magazines. (Ex. A.)[1] In particular, TGH operates http://www.80-lower.com (80% Lowers), http://www.80lowerjig.com (80 Lower Jig), and http://www.ar-15lowerreceivers.com (AR-15 Lowers). (*Id.*) All three websites offer for sale pistol and rifle kits from ghost gun kit manufacturers, such as Polymer80 and Stealth Arms. Under the "Pistol Kits" page on the 80% Lowers site, TGH offers an "AR 15 Pistol Kit," "AR 9 Pistol Kit," "1911 Pistol Kit," "GLOCK Compatible Pistol Kit," "Sig Sauer Compatible Pistol Kit," "Full Size Pistol Kit," "Carry Size Pistol Kit," "1911 80% Frame," "Compact Pistol Kit," and "Subcompact Pistol Kit." (Ex. B.) Under the "Rifle Kits" page, TGH offers "AR 15 Rifle Kits," "LR-308 Rifle Kits," "6.5 Creedmoor Build Kit," and "300 Blackout Build Kit." (Ex. C.) AR-15 Lowers and 80 Lower Jig similarly offer a number of ghost gun kits for sale. On all three websites, TGH has a dedicated page for selling Polymer80 kits. (Exs. D, E, F.) For example, 80% Lowers lists twenty-four different Polymer80 models and kits available for purchase (both in-stock and out-of-stock). (Ex. D; *see, e.g.*, Ex. N.)

As an e-commerce site, TGH offers sales in all fifty states in the United States, where allowed by law. On all three websites, the shipping and returns pages state that sales of ghost gun kits are restricted in certain states—none of which are Maryland. (Exs. K, L, M.) In contrast, the pages note that ammunition sales and sales of high-capacity magazines are restricted in Maryland. (*Id.*)

---

[1] The print outs of TGH's websites, which are included with this response as Exhibits A through O, were obtained on March 25, 2020, at approximately 9 p.m.

On its websites, TGH extolls the benefits of ghost guns created from such parts kits, including the ability to purchase or sell a parts kit without having a Federal Firearms License and the fact that firearms created from parts kits cannot be traced. (Ex. G.) In describing a ghost gun parts kit, TGH notes that these kits go "by a myriad of names: 'Unfinished lower', '80 lower', 'unfinished receiver', and many more." (*Id*.) As TGH notes, the 80% lower receiver parts kits are not firearms when sold, but "[o]nce a single hole is drilled into the 80% lower receiver, it then becomes, by law and definition, a firearm." (*Id.*) TGH also keenly states that "An AR-15 built using an 80% lower will have no serialization or paperwork attached to it by default. Therefore, it is typically impossible to determine the firearm's origin or history." (*Id.*)

TGH operates a one-stop shop for individuals interested in purchasing such untraceable ghost guns. Along with offering the 80% lower receiver parts kits, TGH's websites also sell the additional 20% necessary to assemble a firearm capable of dispelling a bullet—jigs and upper assemblies for pistols and AR-15 rifles. (Ex. H ("To purchase all components required for assembling a working rifle or pistol, pair your upper with a lower parts kit assembly (includes mil-spec 80% lower) and jig."); Ex. O.) In order to aid its customers in the process of building a fully functioning firearm, TGH offers guides for building pistols and rifles from the kits it sells. (Exs. I, J.)

## **ARGUMENT**

### I. **Legal Standard**

Rule 17(c) of the Federal Rules of Criminal Procedure governs the issuance of subpoena *duces tecum* in federal criminal proceedings. Fed. R. Crim. P. 17(c)(1) ("A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial

4

or before they are to be offered in evidence.")  A Rule 17 subpoena is intended to subpoena witnesses or documents at a trial or pretrial hearing.  *See United States v. Rickenbacker*, 27 F.R.D. 485, 486 (S.D.N.Y. 1961) (finding appropriate a defendant's subpoena for the attendance of a prospective witness at a hearing "on a motion to dismiss an indictment" where "an issue of fact must be determined.")

*United States v. Nixon*, 418 U.S. 683 (1974), set forth the standard of review for Rule 17(c) subpoenas.  *See United States v. Rand*, 835 F.3d 451, 462 (4th Cir. 2016) (applying the *Nixon* test to a third-party subpoena); *United States v. Pac. Gas & Elec. Co.*, No. 14-CR-175 (TEH), 2016 WL 3365754, at *3 (N.D. Cal. June 17, 2016) ("the same standard applies" to Rule 17(c) trial subpoenas and pre-trial subpoenas).  A Rule 17(c) subpoena must meet the requirements of "(1) relevancy; (2) admissibility; [and] (3) specificity." *Nixon*, 418 U.S. at 700.  In understanding these requirements, courts look to the Federal Rules of Evidence.

For the relevancy factor, a court must "assess whether the documents sought have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006) (quoting Fed. R. Evid. 401.)  Admissibility too is governed by the Federal Rules of Evidence.  *Id.*  Lastly, specificity may be "satisfied if there is a 'sufficient likelihood,' demonstrated through rational inferences, that the documents being sought contain relevant and admissible evidence." *Id.* (quoting *Nixon*, 418 U.S. at 700).  The specificity requirement is aimed at showing that the requested subpoena "is not intended as a general 'fishing expedition,'" *Nixon*, 418 U.S. at 699-700, and "'to provide the subpoenaed party or other party having standing with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility,'" *Libby*, 432 F. Supp. 2d at 32.  *See also United*

*States v. Poindexter*, 727 F. Supp. 1501, 1510 (D.D.C. 1989) (stating that "exquisite specificity" is not required.)

## II. The Government's Subpoena to TGH Meets all of the Nixon Requirements

The Government's subpoena for limited records showing the volume and revenue of TGH's sale of ghost gun kits in the State of Maryland satisfies all three criteria set forth by *Nixon*.

### A. The Requested Records are Relevant and Admissible as to the Issues at the Pretrial Hearing

Consistent with the argument set forth in the Government's opposition brief and sur-reply, the Government intends to argue at the pretrial hearing that the Defendant's possession of a ghost gun is part of a class of activity that, taken in the aggregate, has a substantial effect on interstate commerce. (*See* ECF Nos. 29, 32.) Since this class of activity has a substantial effect on interstate commerce, the Government will ask that the Court instruct the jury at trial that the commerce element of 18 U.S.C. § 922(g)(1) is satisfied if the Government proves beyond a reasonable doubt at trial that (a) the firearm alleged in the indictment is a ghost gun—a homemade or home-completed and assembled gun—and (b) that the Defendant possessed said ghost gun.

In order to demonstrate the substantial effect of this class of activity on interstate commerce, the Government intends to introduce at the pretrial hearing evidence of ghost gun kit sales in Maryland for the past four years. Ghost gun kit sales are typically conducted over the Internet and the kits are sold by out-of-state companies, such as sellers like TGH.[2] The influx of these kits into Maryland—observable by the volume and revenue of yearly sales data provided by the ghost gun kit manufacturers, distributors, and sellers in response to the Government's

---

[2] The sales data and revenue from Polymer80 that the Government included in its opposition brief is limited only to ghost gun kits that Polymer80 itself shipped to Maryland. As a reseller of Polymer80 kits (as well as other ghost gun kits), TGH's sales are not captured by the data provided by Polymer80.

6

subpoenas—demonstrates that ghost gun kits—as fungible economic substitutes for conventional firearms—can and do displace the possession and sale of regular firearms.

The data provided by ghost gun manufacturers, distributors, and sellers will also evidence how and to what degree ghost guns add to the market for available firearms. By comparing the number of conventional firearms sold in Maryland to the number of ghost gun kits sold in the state for the same year, the Government intends to illustrate the amount by which ghost guns have augmented the conventional firearm market.[3] Moreover, the volume of sales of ghost gun kits in Maryland demonstrates a class of activity, as said kits are converted into ghost guns that are possessed by individuals in the state. Since ghost guns are fungible with conventional firearms, a high volume of intrastate ghost guns, which are easily diverted into illicit channels, would "affect the interstate market or draw [intrastate ghost guns] into the interstate market." *United States v. Hosford*, 843 F.3d 161, 172 (4th Cir. 2016). Evidence of the rising volume of ghost gun kit sales in Maryland before and after the Defendant's arrest is relevant to showing the extent of such displacement and augmentation of the possession of conventional firearms by the possession of intrastate ghost guns. With an increasing number of firearms exempted from the prohibition enacted by Congress in 18 U.S.C. § 922(g)(1), based on the potential intrastate nature of ghost gun possession, Congress's intent to ensure that all firearms are kept out of the hands of "irresponsible persons, including convicted felons," would be frustrated, *Barrett v. United States*, 423 U.S. 212, 220 (1976), and its "demand-side restriction prohibiting felons from possessing firearms" would be hindered, *United States v. Peters*, 403 F.3d 1263, 1277 (11th Cir. 2005).

---

[3] The Government is not aware of the availability of comprehensive data regarding the sale of ghost guns either in Maryland or nationally. Additionally, as the President and Founder of TGH states in his affidavit, TGH's sales data is not generally available. Thus, the information the Government has sought from TGH is "not otherwise procurable . . . by exercise of due diligence" in advance of the pretrial hearing. *Nixon*, 418 U.S. at 699.

Therefore, evidence of TGH's sales in Maryland are germane to the evidentiary support that the Government intends to present at the pretrial hearing in order for the Court to find that possession of a ghost gun as a class of activity, taken in the aggregate, has a substantial effect on interstate commerce. *See Pac. Gas & Elec. Co.*, 2016 WL 3365754, at *4 (finding Rule 17(c) subpoena met the relevance requirement where it made "more probable the Government's argument . . . (even if only minimally so).") Accordingly, the Government's subpoena for a limited subset of yearly volume and sales data for a defined time period meets the minimal relevance threshold of Rule 401 of the Federal Rules of Evidence, and such records would be admissible at the hearing under the business records exception to the hearsay rule, Rule 803(6). *See also* Fed. R. Evid. 402 ("All relevant evidence is admissible, except as otherwise provided . . . .")

### B. The Government Subpoena was Specific and Limited

In seeking evidence substantiating the volume and revenue of yearly sales conducted by ghost gun kit sellers in Maryland, the Government requested three narrow categories of relevant and admissible information from TGH within a specific timeframe. *See Libby*, 432 F. Supp. 2d at 31 (noting that specificity is "satisfied if there is a 'sufficient likelihood,' demonstrated through rational inferences, that the documents being sought contain relevant and admissible evidence.")

In its first request, the Government asked TGH to provide the "total number (per year) of unfinished pistol and rifle parts kits sold and/or shipped to an addressee in the State of Maryland." By requesting total yearly sales data, the Government took care to ensure that its request would not result in the production of "thousands of pages of documents." *Cf. United States v. Lindberg*, No. 5:19-CR-22-MOC-DSC-1, 2019 WL 7000089, at *2 (W.D.N.C. Dec. 20, 2019) (denying subpoena in part where defendant requested six expansive categories of documents and finding that defendant was engaged in "fishing expedition.") TGH was founded in 2014, and thus, the subpoena's request for records is within the relevant operating years for the business. (Ex. A.)

Possession of ghost guns as a class of activity encompasses both categories of firearms—pistols and rifles—as possession of either firearm by a felon would undermine Congress's intent in the Gun Control Act. The Government's request captures sales data for both categories of ghost guns in order to show the scope of this class of activity.

TGH attempts to argue that because the Government provided a list of possible ways in which ghost guns are referred to in the market that this somehow makes the subpoena broad. As TGH itself notes on its website, ghost gun kits go by a number of different terms. (Ex. G.) As such, while the Government made a specific and limited request regarding the "total number (per year) of unfinished pistol and rifle parts kits," the Government also listed names that ghost gun kits are typically sold under to explain and define its request. For example, the first three items on the list are all variations on Polymer80 kits. "PF940C" refers to a model of a Polymer80 kit, one of a number that TGH carries on its websites. (Ex. N.) The rest of the terms are variations on ghost gun kits advertised by TGH on its websites. (*See, e.g.,* Exs. B, C.) Consequently, the Government attempted to provide sufficient detail to cabin its request, while also ensuring that the yearly sales records for the relevant time period captured the ghost gun kits sales by TGH in Maryland—as dictated by the argument the Government intends to put forth. *Cf. United States v. Rajaratnam*, 753 F. Supp. 2d 317, 322 (S.D.N.Y. 2011) (finding that subpoena requests for "[a]ll documents" and "[a]ll documents or other communications" was not an improper fishing expedition.)

The Government's second and third requests are similarly narrow. The second request asks for the unit prices of the ghost gun kits that TGH has sold in Maryland for the past four years. Lastly, the third request asks TGH for the annual revenue from just the sale of ghost gun kits—not all the items TGH sells—in order to translate this yearly sales data and unit price into an

9

understanding of the revenue generated, and the monetary effect, from the sale of ghost gun kits in Maryland.  In light of the fact that TGH does in fact sell ghost gun kits, has offered these kits since 2014, and sells these kits to Maryland residents, as supported by the affidavit from TGH's President and Founder, the Government's request is specific as to "the information contained or believed to be contained in the documents sought" and is not a "fishing expedition."  *See Libby*, 432 F. Supp. 2d at 31.

The Government was mindful to request only the records relevant to showing how possession of ghost guns as a class of activity has a substantial effect on interstate commerce.  The Government's subpoena reflects this limited and narrow request.

### C.     TGH has not Demonstrated That Compliance Would be Unreasonable

By demonstrating that its subpoena to TGH meets the requirements of (1) relevancy, (2) admissibility, and (3) specificity, the Government has established that its subpoena is neither "unreasonable [n]or oppressive such that it must be either quashed or modified."  *Libby*, 432 F. Supp. 2d at 31.

However, in arguing that compliance would be unreasonable, TGH comes to its *raison d'etre* for moving to quash the subpoena.  TGH asserts that it participates in a "highly competitive industry" and that a public disclosure of limited sales data would harm TGH's business interests. TGH makes an argument of an amorphous and unsubstantiated harm if it is required to comply with the subpoena.  For one, TGH does not articulate how the disclosure of limited sales data for one state would in fact harm TGH's business.  In addition, TGH makes a speculative claim of harm on the off chance that a competitor were to review TGH's limited yearly sales and revenue records from this matter.  Neither of these are a cognizable basis to quash the Government's subpoena as unreasonable.  *See Rand*, 835 F.3d at 463 (stating that a subpoena should be quashed as unreasonable or oppressive if it is "irrelevant; abusive or harassing; overly vague; or excessively

10

broad.")  Moreover, by failing to make a good cause showing of harm, TGH has not shown that a protective order is warranted in this case.  *See* Fed. R. Crim. P. 16(d)(1) (stating that "[a]t any time the court may, for good cause [] restrict discovery"); *see also Rajaratnam*, 753 F. Supp. 2d at 325 (asking parties for protective order based on "policy of maintaining confidentiality of tax returns.")

## CONCLUSION

Based on the above, the Court should deny the TGH's Motion to Quash the Third Party Subpoena.

Respectfully submitted,

\_\_\_/s/_____
Rajeev R. Raghavan
Erin B. Pulice
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 27, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/
Rajeev R. Raghavan
Assistant United States Attorney